## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WENDY MULAC,          )
                                )
        Plaintiff,       )      Case No. 11 C 1887
                                )
v.                        )      Magistrate Judge Sidney I. Schenkier
                                )
MICHAEL ASTRUE,     )
Commissioner of Social Security,  )
                                )
        Defendant.     )

### MEMORANDUM OPINION AND ORDER[1]

Wendy Mulac seeks an order reversing or remanding the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under Title II of the Social Security Act (doc. # 23: Mot. for Summ. J.). The Commissioner has filed a response (doc. # 28), in which he asks the Court to affirm the denial of benefits. For the reasons set forth below, the Court grants Ms. Mulac's motion.

### I.

Ms. Mulac was 43 years old when she filed her application for benefits on February 21, 2006 (R. 77). She alleges a disability onset date of January 1, 2002 due to diabetes, neuropathy, depression, fibromyalgia, arthritis, pain in her right shoulder, and knee surgery (R. 82). Her claim was denied initially on July 18, 2006 (R. 78), and upon reconsideration on February 22, 2007 (R. 94). Ms. Mulac requested a hearing before an Administrative Law Judge ("ALJ"), which was held on May 6, 2008 (R. 28). ALJ John S. Pope issued his decision denying benefits on February 4, 2009 (R. 17). Ms. Mulac timely requested review of the ALJ's decision, which the Appeals Council

---

[1]On May 9, 2011, by consent of the parties and in accordance with 28 U.S.C. § 636(c), this matter was referred to this Court for all further proceedings, including the entry of final judgment (doc. # 9).

denied on January 14, 2011 (R. 1). Thus, the ALJ's decision stands as the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## II.

Ms. Mulac is 5'4" and weighed about 253 pounds at the time of the hearing (R. 36). She has a tenth grade education (R. 37). At the time of the hearing, she was separated from her second husband and living with a roommate in a single-story house (R. 36). She has two adult children from her first marriage (R. 243). Ms. Mulac held part-time waitress jobs intermittently from 1996 until March 2005, when she stopped working because "[it] was just too hard to waitress. My sugar would get too low" (R. 145-46).

### A.

Ms. Mulac is a diabetic and suffers from a range of other ailments. From 2003 until 2007, Ms. Mulac was treated by Maria Lentzou, M.D., of the Center for Wellness and Weight Management (*see, e.g.*, R. 284-90, 354-73). During that period, Ms. Mulac was prescribed an array of medications to control her diabetes, but it remained poorly controlled (*see, e.g.*, R. 284, 354, 361, 367, 368).

As early as March 2003, Ms. Mulac was diagnosed with peripheral neuropathy, or nerve damage (R. 371). On March 20, 2003, Ms. Mulac visited Dr. Lentzou with chest tightness and pain in her right knee and toe, and she returned the next day complaining of anxiety, pain, and coldness in her feet (R. 371-72). Dr. Lentzou prescribed Gluconase (for diabetes), Neurontin (for neuropathic pain), and Effexor (for depression), and wrote a note to excuse Ms. Mulac from work for three days (*Id.*). On March 31, 2003, Ms. Mulac complained that her right knee hurt and her hand was stiff (R. 370). Dr. Lentzou wrote a note to excuse her from work for several more days, and advised Ms. Mulac to consider a day job to minimize her fibromyalgia (joint and muscle pain) (*Id.*).

2

On June 4, 2003, a physician prescribed Ms. Mulac with Xanax (for anxiety), Effexor, and Sonata (for insomnia) (R. 369). On November 20, 2003, Dr. Lentzou changed her anti-anxiety medicine to Lexapro, and prescribed high blood pressure medication and Tramadol for pain (R. 368).

On January 22, 2004, Ms. Mulac complained of numbness and tingling in her left hand, as well as agitation and irritability (R. 367). In addition to diabetes and neuropathy, Dr. Lentzou diagnosed her with metabolic syndrome and carpal tunnel syndrome (*Id.*). She prescribed Lantus (insulin), Topamax, Gluconase, and a wrist splint, and noted without explanation that Ms. Mulac refused to increase her dosage of Lexapro (*Id.*). A February 3, 2004 MRI indicated a 3 mm tumor in Ms. Mulac's pituitary gland (R. 225).

On May 25, 2004, Ms. Mulac complained of pain in her side, a popping in her right knee, numbness and tingling in her foot, and depression (R. 365). Dr. Lentzou noted that her diabetes was controlled with Lantus and that she was having peripheral neuropathy symptoms (*Id.*). She diagnosed Ms. Mulac with depression, continued to prescribe Lexapro, and referred her to counseling (*Id.*).

On August 23, 2004, neurologist Franco M. Campanella, D.O., examined Ms. Mulac and opined that she may have restless leg syndrome (R. 363). Ms. Mulac complained of a "deep pointing pain in the thigh and calves, mostly at rest" (*Id.*). However, her gait was within normal limits (*Id.*). Mirapex did not relieve her pain, so Dr. Campanella suggested Sinemet (*Id.*).

On February 25, 2005, Ms. Mulac was admitted to the hospital complaining of chest pain and numbness in her tongue and lips (R. 202-03). She complained of sharp pain in her chest that radiated down to her right arm, forearm, and wrist (R. 203, 205). A chest exam revealed that her heart size was borderline prominent (R. 214), and laboratory tests registered high blood sugar levels (R. 206).

3

However, a sonogram of her carotid artery was normal (R. 213). Doctors diagnosed her with chest pain, diabetes, tobacco addiction, and obesity (R. 204), and prescribed Diclofenac for chest pain because Tramadol did not seem to work (R. 202).

Ms. Mulac continued to meet either in person or over the phone with Dr. Lentzou periodically through 2005 and 2006, with some of the same recurring complaints, such as pain, swelling, and numbness in her legs and anxiety (*see, e.g.*, R. 357). On February 15, 2006, Ms. Mulac suffered a crush injury to her left foot (R. 215). While it was not fractured (R. 218), Ms. Mulac sought treatment from podiatrist D. Duane Brann, D.P.M., of the Parkview Musculoskeletal Institute on August 28, 2006 (R. 291-92). Dr. Brann stated that Ms. Mulac denied trouble walking, but also reported that her foot pain was "worse at rest and relieved with ambulation" (*Id.*). An x-ray showed no fracture or dislocation, and while the examination showed no swelling, it revealed a deformity in both feet (*Id.*). .

On May 12, 2006, Dr. Lentzou completed two reports for the Bureau of Disability Determination Services ("DDS"). Dr. Lentzou listed Ms. Mulac's diagnosis as diabetes complicated by neuropathy and osteoarthritis (R. 233-34). Dr. Lentzou reported that Ms. Mulac complained of lower extremity pain and tenderness in her fibromyalgia trigger points (*Id.*). Ms. Mulac's grip strength was normal, and she had no significant limitations in reaching, handling, or fingering (R. 234). Treatment with Lyrica, Neurontin, Tramadol, and Valium had been ineffective and caused Ms. Mulac fatigue (R. 236). Dr. Lentzou further reported that Ms. Mulac's mood and affect were anxious and that she occasionally acts out of frustration with her roommate, but her mental ability was intact (R. 233, 238). She stated that Ms. Mulac can clean her house, but with frequent breaks, and that she is unable to manage her own funds (*Id.*).

4

Dr. Lentzou indicated that Ms. Mulac's ambulation was restricted, although she did not require an assistive device to walk (R. 235). She stated that Ms. Mulac could stand or sit for up to 30 minutes, but then needed to assume an alternate position for 45 minutes (R. 232, 235).[2] Dr. Lentzou further noted that in addition to alternating between sitting and standing, Ms. Mulac would need to have "periods of walking around during an 8 hour working day" (R. 235). Dr. Lentzou did not specify how often Ms. Mulac would need walk around, or how much of the work day this would involve. In response to a question on the report asking if "a job which permits shifting positions at will from sitting, standing, walking [is] needed," Dr. Lentzou did not answer yes or no (R. 235). But, in the immediately following portion of the form asking her to explain the answer, Dr. Lentzou wrote that the "patient [is] unable to conform with job requirements" (*Id.*).

In June 2006, Ms. Mulac underwent testing to address her complaints of neck and arm pain, headache, and numbness in her back and lower extremities. MRIs of Ms. Mulac's pituitary gland and cervical spine showed no change in her pituitary compared to the 2004 MRI but mild arthritic changes and protrusions in two vertebrae compared to an earlier scan (R. 294-95, 298). A June 11, 2006 scan of her abdomen and pelvis revealed that she had a hiatal hernia, her uterus was prominent in size, and she had a probable ovarian cyst (R. 293).

**B.**

On June 13, 2006, clinical psychologist William N. Hilger, Ph.D., completed a consultative mental examination for DDS. He diagnosed Ms. Mulac with: adjustment disorder of adulthood with depression due to separation from her husband and physical problems, estimated low average

---

[2]We confess to some confusion at this point. If Dr. Lentzou concluded that Ms. Mulac could neither sit nor stand for more than 30 minutes before alternating positions, it is hard to see (and Dr. Lentzou does not explain) how Ms. Mulac could sit or stand for 45 minutes in the "alternate position."

intellectual functioning, alleged back and shoulder conditions, insulin-dependent diabetes with neuropathy, status post right knee surgery, alleged fibromyalgia, and arthritis with no obvious invalidism or pain behavior observed (R. 245). He noted that Ms. Mulac had never received psychiatric treatment but was taking Lexapro for depression (R. 242). Her mood ranged from fine to very depressed, and she struggled with extreme anger (R. 243). In December 2005, Ms. Mulac reportedly took an overdose of pills, but did not seek treatment (*Id.*). She did not experience hallucinations, delusions, or psychotic symptoms, and she denied substance use but admitted smoking two packs of cigarettes a day (*Id.*).

As for her daily functioning, Dr. Hilger observed that Ms. Mulac has a few friends, shops on occasion, does light housework, bathes and dresses herself, and handles her own finances (R. 243). He noted that she had separated from her husband of 13 years one year earlier (*Id.*). Dr. Hilger assessed Ms. Mulac's judgment and general knowledge as minimal, and her conceptual and abstract reasoning as fair (R. 244). He concluded that Ms. Mulac appears to have "fair mental potential but no motivation to pursue or to perform work related activities involving understanding and memory, sustained concentration and persistence, social interaction and adaptation" (R. 245).

On June 17, 2006, internist Chukwu Emeka F. Ezike, M.D., M.P.H., completed a consultative physical examination for DDS after reviewing Ms. Mulac's disability and medical reports and examining and interviewing her for 30 minutes (R. 247-50). Dr. Ezike noted that Ms. Mulac complained of right shoulder pain, diabetic neuropathy, depression, arthritis, and fibromyalgia (R. 247). She reported constant pain in her feet, ankles, knees, hands, back, and shoulders, which pain intensified with activity and aggravated her depression (*Id.*). Ms. Mulac also reported numbness and tingling in her hands and feet (*Id.*).

Ms. Mulac reported that she could work for 30 minutes at a time, stand or sit for one hour at a time, and is able to clean her house, dress, and shop on her own (R. 248). Dr. Ezike found that Ms. Mulac was obese at 250 pounds (*Id.*). Dr. Ezike stated that she was able to walk more than 50 feet without support, had a normal gait, performed well on the straight leg test, and had normal range of motion in her hips, knees, ankles, lumbar spine, shoulders, elbows, and wrists (R. 249). He noticed minimal swelling in her fingers and a flexion deformity in her left ring finger, but her grip strength and ability to grasp objects was normal (R. 249). He noted that she was taking insulin, Lexapro, Diazepam, Gabapentin, Tramadol, and Daypro (R. 248). With respect to Ms. Mulac's mental status, Dr. Ezike observed that she had a normal affect, with no signs of depression, agitation, irritability, or anxiety (R. 249).

On June 29, 2006, Richard Bilinsky, M.D., completed a physical residual functional capacity ("RFC") assessment for DDS. The primary diagnosis was history of fibromyalgia, the secondary diagnosis was diabetes, and diabetic neuropathy was marked as "other" alleged impairment (R. 265). Dr. Bilinsky noted that he lacked access to any treating or examining source statements regarding Ms. Mulac's physical capacities (R. 271). Notwithstanding that, he concluded that Ms. Mulac had no limitations of manipulation, vision, communication, or environment (R. 267-69). However, he found that she had limitations of exertion: she could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit with normal breaks for about 6 hours in an 8-hour workday (R. 266). He also noted that Ms. Mulac had minimal finger swelling and a deformity in the fourth finger of her left hand (R. 272). Dr. Bilinsky reported that Ms. Mulac could walk unassisted more than 50 feet and that she had a normal gait, grip strength, and range of motion in the major joints (*Id.*).

On July 17, 2006, Jerrold Heinrich, Ph.D., completed a Psychiatric Review Technique Form for DDS. Dr. Heinrich stated that Ms. Mulac suffered from adjustment disorder of adulthood with depression, but the disorder was not severe and did not satisfy the diagnostic criteria for affective disorders under 12.04 (R. 251, 254). Under the Paragraph B criteria, the Rating of Functional Limitations, Dr. Heinrich found no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration (R. 261). He further concluded that the evidence does not establish the presence of the C criteria (R. 262).

On January 16, 2007, Paul Smalley, M.D., completed a reconsideration of the physical RFC after reviewing additional records from Ms. Mulac's chiropractor and podiatrist (R. 314-16).[3] Dr. Smalley noted that Ms. Mulac denied any changes to or worsening of her condition, and he affirmed the initial RFC (R. 316). On February 6, 2007, Kirk Boyenga, Ph.D. completed a reconsideration of the PRTC, and affirmed Dr. Heinrich's determination (R. 314-16).

## C.

Ms. Mulac's medical treatment continued after the DDS reports were completed. On May 22, 2007, Dr. Lentzou reported that previous treatment of Ms. Mulac's neuropathy had failed, and she prescribed a new pain medication, Ultracet (a combination of acetaminophen and Tramadol) (R. 354). In addition, Dr. Lentzou prescribed Metformin for diabetes and ordered an x-ray of Ms. Mulac's left knee (Id.). Dr. Lentzou also noted that "obesity exacerbat[ed] [her] symptoms" (Id.).

---

[3]We note that the chiropractic treatment records are dated January 26, 2007 (R. 304), and were received by Dr. Smalley on February 6, 2007 (R. 316) -- all after the January 16, 2007 date on Dr. Smalley's report (R. 314). The chiropractor reported that Ms. Mulac performed below the norm on three out of seven movements in a lumbar spine range of motion test, and she performed significantly below the norm on leg raise tests (R. 304). On muscle tests, Ms. Mulac exhibited a motor deficit in her hip (R. 305).

On December 17, 2007, Ms. Mulac was admitted to the hospital for two days for treatment of chest pain (R. 319). She complained of acute pain in her left clavicle, shoulder, and shoulder blade radiating down to her chest (R. 320, 324). Her range of motion, while painful in the shoulder, was intact in all extremities (R. 320). Her blood glucose level was recorded at 337 and 371 one hour apart (R. 322). Doctors prescribed Toradol, Vicodin, insulin, nitroglycerin, aspirin, morphine, and Benadryl (R. 321-22).

In February 2008, Ms. Mulac began treating with a new primary care doctor, Paul McFarlane, M.D. (R. 40). In treatment notes dated April 17, 2008, Dr. McFarlane highlighted Ms. Mulac's chest pain and reported that Paxil was not effective for her depression (R. 379). Laboratory tests and studies from April 2008 showed that Ms. Mulac had high cholesterol, high triglycerides, and high glucose (R. 389-91), and that her heart size was within the upper limits of normal, unchanged from the December 17, 2007 exam (R. 388).

Dr. McFarlane referred Ms. Mulac to a foot specialist to treat her diabetic neuropathy, bunions, and tendonitis (R. 384). The foot specialist applied a wrap, ordered x-rays, scheduled a follow-up visit, and recommended orthotics (*Id.*). In a clinic note dated April 29, 2008, podiatrist Tara Sakevich, D.P.M., stated that Ms. Mulac still complained of foot pain (R. 383). Upon reviewing x-rays, Dr. Sakevich found a deformity in Ms. Mulac's foot and bone spur in the heel (*Id.*). Dr. Sakevich's assessment was that she suffered from tendonitis, venous valvular insufficiency, and diabetes (*Id.*). To treat her tendonitis, Dr. Sakevich taped her right leg, prescribed compression hose, and recommended orthotics (*Id.*).

## III.

At the administrative hearing, held on May 6, 2008, Ms. Mulac testified that her diabetes has been difficult to control, and that over the past year, her blood sugar level fluctuated from approximately 24 to 380 (R. 56). Medication did not control her diabetes (R. 44).

Ms. Mulac testified that she feels "so many different types of pain" – in her hands, wrists, back, and knees (R. 52). She characterized her pain as constant: mild in the morning and intensifying as the day progressed (*Id.*). Activity worsened the pain, especially in her back, and once or twice a week, her pain was so intense that she did not get out of bed (R. 53). She takes a number of medications to treat her pain and diabetes, including Tramadol and Imitrex, but they were either ineffective or caused side effects, such as chest tightness and itchiness (R. 44). She also testified that she suffers from neuropathy, where she gets a burning pain and loss of sensation in her feet (R. 65).

Ms. Mulac also testified that she suffers from depression, anxiety, and mood swings. She takes Paxil for depression (R.49-50), because Lexapro was ineffective (R. 63-64).

With respect to her daily activities, Ms. Mulac stated that she spends "all day" cleaning the house, but takes frequent breaks to sit or lie down due to her pain, especially back pain (R. 45, 58-59). She stops cleaning when her girlfriend visits her in the afternoon, about five days a week (R. 50). Ms. Mulac does laundry and dishes, but she has difficulty sweeping because it aggravates her back pain (R. 47). She enjoys gardening, but can no longer do it (R. 48). She exercises on a "glider" about twice a week, 5 minutes at a time (*Id.*). She reported no problems bathing or dressing herself (R. 47). Ms. Mulac estimated that she could carry up to 20 pounds, and she could walk or sit 2 hours on and off throughout an 8-hour day and stand on and off for 1 hour (R. 54-55).

The ALJ asked Vocational Expert ("VE") James Breen to assume a hypothetical person between 39 and 46 years old, with a tenth-grade education, past relevant work as a waitress, limited to light work, with a sit/stand at will option, and limited to simple, repetitive tasks (R. 70). The VE testified that this person could not perform Ms. Mulac's past relevant work (*Id.*). The VE further testified that the hypothetical person could not perform light occupations because of the sit/stand at will option (*Id.*). However, the person could perform sedentary work, "as long as the sit-stand at will did not take the person off-task greater than 10 percent of the day" (*Id.*). The VE then testified that the person could perform the following unskilled jobs: charge account clerk, information clerk, and eyeglass assembly (R. 71). However, the VE testified that all jobs would be ruled out if the ALJ found Ms. Mulac totally credible, because of "the need to take frequent breaks throughout the day. Her sit-stand-walk total would not amount to eight hours total of the day" (*Id.*).

After the hearing, Ms. Mulac submitted additional evidence for the ALJ to consider. The evidence included treatment notes from May 1, 2008, on which date Dr. McFarlane noted continued swelling and pain in Ms. Mulac's ankle and feet, and he diagnosed Ms. Mulac with uncontrolled, insulin-dependent diabetes and prescribed Lantus (R. 377-78). On May 5, 2008, Dr. Sakevich examined Ms. Mulac, and in addition to her previous diagnoses, diagnosed Ms. Mulac with bunions (R. 382). Dr. Sakevich prescribed a CAM walker (walking boot) (*Id.*). On May 22, 2008, tests showed that the blood pressure in Ms. Mulac's legs was within acceptable limits (R. 387).

## IV.

In his opinion, dated February 4, 2009, the ALJ applied the five-step analysis. At Step 1, he found that Ms. Mulac was not engaged in substantial gainful activity, and at Step 2, he found that

Ms. Mulac had the following severe impairments: diabetes, diabetic neuropathy, fibromyalgia, obesity, and depression (R. 22).

At Step 3, the ALJ found that Ms. Mulac's mental impairment did not meet or medically equal Listing 12.04, for affective disorders (R. 23). This was the only listing that the ALJ considered. In analyzing whether Ms. Mulac's mental limitations satisfied the "paragraph B" criteria, the ALJ found the she had no restriction in activities of daily living ("ADLs"); mild difficulties in social functioning and concentration, persistence, and pace; and no episodes of decompensation (R. 23-24). In making this determination, the ALJ relied on statements Ms. Mulac made to the DDS examiners, Drs. Hilger and Ezike, that she could dress and bathe herself and perform household chores, and that she could work for up to thirty minutes, stand for about an hour, sit for an hour, and lift forty pounds (*Id.*).

Next, the ALJ found that Ms. Mulac had the RFC to perform sedentary work, except that she must be able to sit/stand at will and would be limited to simple repetitive tasks (R. 24-25). In making this determination, the ALJ cited to Ms. Mulac's hearing testimony, the disability reports she filled out, Dr. Ezike's findings, and the examinations conducted by Drs. Brann and McFarlane (R. 25-26).

In assessing Ms. Mulac's testimony, the ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. 25). The ALJ contrasted Ms. Mulac's complaints of swelling and stiffness in her hands with the findings of Dr. Ezike – showing normal grip strength, fine and gross

manipulation, and minimal swelling in her fingers (R. 25). The ALJ also contrasted Ms. Mulac's complaints of "constant pain in her feet, ankles, knees, hands, back and shoulders" with Dr. Brann's findings that her feet were not fractured or swollen and their range of motion was unrestricted, despite Dr. Brann's finding of tenderness and deformity in her feet and Dr. Sakevich's prescription for a walking boot (*Id.*).

The ALJ then compared Ms. Mulac's claims of ongoing low back pain with the results of her 2006 MRI, which "revealed only mild arthritic changes" (R. 26). The ALJ also noted that Ms. Mulac's complaints of chest pain contrasted with her February 2005 cardiac examination, which was normal, and an April 2008 x-ray, which showed that Ms. Mulac's heart size was normal (*Id.*).

In reviewing Ms. Mulac's diabetes and diabetic neuropathy, the ALJ noted Ms. Mulac's long history of diabetes and May 2008 blood glucose testing showing Ms. Mulac's A1C level was 10.6 (reflecting poorly controlled diabetes), but stated that she denied any new complaints stemming from diabetes and that results from her nerve test were "essentially normal" (R. 26). The ALJ concluded that the medical evidence supported his RFC assessment and "showed that her impairments were not as functionally limit[ing] as she alleged" (*Id.*).

At Step 4, the ALJ found that Ms. Mulac did not have the RFC to return to her previous work as a waitress (R. 26). Nevertheless, at Step 5, the ALJ found that Ms. Mulac could perform "the full range of sedentary work," because "the additional limitations have little or no effect on the occupational base of unskilled sedentary work" (R. 27). Thus, the ALJ concluded that Ms. Mulac was not disabled (*Id.*).

**V.**

We begin our analysis of the ALJ's decision with a review of the relevant legal standards. To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The social security regulations require the ALJ to apply the following sequential five-step analysis to determine whether a claimant is disabled under the law: (1) whether the claimant is currently performing any substantial gainful activity; (2) whether her alleged impairment or combination of impairments is severe; (3) whether any of her impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether she is unable to perform her past relevant work based on her RFC; and (5) whether her RFC renders her unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proof in Steps 1 through 4, and the burden shifts to the Commissioner in Step 5. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

Judicial review of ALJ decisions is deferential: we uphold an ALJ's decision if it is supported by substantial evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). To meet this standard, the ALJ's opinion must build "an accurate and logical bridge" between the facts of the case and the outcome. *Clifford*, 227 F.3d at 872. The ALJ must consider all relevant evidence, not only the evidence that favors his or her ultimate conclusion, and must articulate the reasons he or she rejected certain evidence. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

14

## VI.

The ALJ's opinion contains several errors that require remand. Below, we discuss two of these errors, but note other points that the ALJ should consider addressing on remand.

## A.

Ms. Mulac argues that the ALJ improperly analyzed Ms. Mulac's credibility as to her complaints of pain and other symptoms (doc. # 24: Pl.'s Mem. at 7). We agree.

If the claimant has a medically determinable impairment that could reasonably be expected to produce pain, an ALJ must make this credibility finding by examining factors like the claimant's daily activities, pain and other symptoms, medication, and limitations. 20 C.F.R. § 404.1529(c)(1); *see also* SSR 96-7p. Without a discussion of these relevant factors, the ALJ fails to build the requisite logical bridge between the evidence and his conclusion that the claimant's testimony was not credible. *Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012).

The ALJ's discussion here did not satisfy these requirements. The ALJ failed to consider the significant amount of pain medication Ms. Mulac was prescribed. Despite Ms. Mulac's ongoing use of various pain medications – including Tramadol, Lyrica, Neurontin – the ALJ makes no mention of her medication, except to note that "her medication caused side effects such as itchiness and chest pain" (R. 25). As demonstrated in the medical record, however, she continued taking pain medication despite these side effects.

In addition, many of Ms. Mulac's pain complaints were recorded in Dr. Lentzou's reports, which the ALJ all but ignored. Dr. Lentzou, a treating physician, authored a number of reports in which she commented on Ms. Mulac's conditions and resulting pain (*e.g.*, R. 233-35, 357, 365, 367). If an ALJ decides to give a treating physician's opinion less than controlling weight, he must give

"sound reasons" for so doing. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see also Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). Even then, the ALJ must state what weight (even if not controlling) he accords to the treating physician's opinions, and why. *Scott*, 647 F.3d at 740. Simply disregarding the treater's opinions without explanation, as the ALJ did here, does not satisfy that obligation.

Moreover, the ALJ ignored – without explanation – other evidence as to the severity of Ms. Mulac's pain. For example, despite both her podiatrists noting continued pain, deformity, tendonitis, bunions, bone spur, and tenderness in her feet (R. 291-92, 382-83), the ALJ discounted Ms. Mulac's claims of foot pain because Dr. Brann noted good range of motion and no swelling or fracture (*Id.*).

The ALJ's discounting of Ms. Mulac's complaints of pain thus failed to account for the evidence which supported Ms. Mulac's claims concerning the severity of her joint and bone pain. In so doing, the ALJ failed to meet "the requirement that administrative law judges carefully evaluate all evidence bearing on the severity of pain and give specific reasons for discounting a claimant's testimony about it. . . . The etiology of pain is not so well understood, or people's pain thresholds so uniform, that the severity of pain experienced by a given individual can be 'read off' from a medical report." *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (citing *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006)). For this reason, a remand is required.

**B.**

Plaintiff also argues that there was not a sufficient medical basis for the RFC determination in the ALJ's opinion (Pl.'s Mem. at 9). We agree.

The ALJ found that Ms. Mulac has the RFC to perform sedentary work with a sit/stand option at will and limited to simple, repetitive tasks (R. 24). No medical expert in the record, however, opined that Ms. Mulac could perform sedentary work.

Ms. Mulac's treating physician, Dr. Lentzou, cast doubt upon Ms. Mulac's ability to work at all (*see* R. 235). The ALJ ignored without explanation Dr. Lentzou's opinion limiting Ms. Mulac's ability to sit or stand to at most 45 minutes at a time, and stating that Ms. Mulac would need to have periods of walking around during an eight-hour working day (R. 235). As the VE testified, those limitations would entirely preclude any sedentary work if they took Ms. Mulac off task for more than ten percent of the work day (R. 70-71).

DDS consultant Dr. Bilinsky (albeit without the benefit of any treating source statements) completed a physical RFC assessment opining that Ms. Mulac could perform light work (R. 266). However, that opinion does not provide the necessary medical basis for the ALJ's less restrictive RFC assessment. As the court of appeals held in an analogous situation in *Terry v. Astrue*, "although another state agency doctor concluded that [the claimant] could perform light work," that opinion does not support the ALJ's determination that the claimant was capable of performing sedentary work where "the ALJ did not discuss th[at] opinion at all or resolve the conflict between it and the opinions of the other physicians." *Terry*, 580 F.3d at 476.

The ALJ did nothing to resolve the conflict between Dr. Lentzou and Dr. Bilinsky. The ALJ was not entitled to resolve that conflict simply by ignoring Dr. Lentzou's opinion. The ALJ offers no explanation, based on the medical evidence, for his finding that Ms. Mulac could perform sedentary work, which suggests that the ALJ "impermissibly 'played doctor' and reached his own

independent medical conclusion" in determining Ms. Mulac's RFC. *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009). This error requires remand.

C.

Because of our decision to remand on the foregoing grounds, we do not reach the other issues raised by plaintiff. However, in order to provide some additional guidance, we offer several observations for the ALJ to consider on remand.

*First*, plaintiff challenged the ALJ's failure to consider Ms. Mulac's obesity in combination with her other impairments, despite finding that Ms. Mulac's obesity was a "severe" impairment (R. 22). *See Martinez*, 630 F.3d at 698-99; *see also Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("the ALJ must specifically address the effect of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic"). We remind the ALJ that he must make clear his consideration of Ms. Mulac's obesity, and how it affects (if it does) her RFC.

*Second*, we note two other matters for the ALJ to consider on remand, which were not expressly raised in plaintiff's briefs. As we explained above, the ALJ did not give the opinions of Ms. Mulac's treating physicians – Drs. Lentzou and McFarlane – controlling weight, and the ALJ did not indicate how much weight he gave to their opinions. *See Scott*, 647 F.3d at 740 (an ALJ must present "sound reasons" for refusing to give a treating doctor's assessment controlling weight, and must determine what value the assessment did merit); *see also Moss*, 555 F.3d at 561 (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ must take care on remand to make clear what weight he gives to the opinions of the treaters, and his reasons for giving anything other than controlling weight to them. In addition, the ALJ only considered Listing 12.04, for affective disorders, and failed to

18

consider at Step 3 whether Ms. Mulac's impairments met or equaled a listing for any of Ms. Mulac's severe physical impairments (R. 22). *See Ribaudo*, 485 F.3d at 583 (although the claimant has the burden of showing that her impairment meets or equals a listing, the ALJ must specify which listings he is considering and his failure to do so, if combined with a "perfunctory analysis," may require a remand). The ALJ should expressly address this point on remand.

*Third*, we note that the record contains one medical report dated after the issuance of the ALJ's opinion. On February 25, 2009, Ms. Mulac received a physical therapy evaluation at Advocate Christ Medical Center (R. 197). The physical therapist ranked Ms. Mulac's pain at a 4 out of 10 in her back, hip, knee, neck, arm, and ankle; rated her trunk motion at 60 to 70 percent of normal; and gauged her trunk, hip, and knee muscle strength at 50 to 60 percent of normal (*Id.*). The physical therapist observed that Ms. Mulac struggled to perform daily activity without limitations or deviations and had poor self-management techniques (*Id.*). On remand, the ALJ should consider this evidence, along with any additional evidence that has developed.

## CONCLUSION

For the reasons set forth above, we grant Ms. Mulac's motion to remand (doc. # 23). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: August 10, 2012**

19